UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUAN RUIZ-SANTOS,<br>    Petitioner,<br><br>v.<br><br>LUIS SPENCER,<br>    Respondent. | CIVIL ACTION<br>NO. 05-10654-GAO |

**RESPONDENT'S OPPOSITION TO HABEAS CORPUS PETITION**

The respondent, Luis Spencer, hereby opposes the petition for habeas corpus relief filed by Juan Ruiz-Santos (the "petitioner"). As grounds, the respondent states that the decision of the Massachusetts courts was neither contrary to, nor an unreasonable application of clearly established federal law as established by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). Nor were the facts as found by the Massachusetts courts objectively unreasonable in light of the evidence presented at trial. 28 U.S.C. § 2254(e)(1).

**BACKGROUND**

On March 3, 1999, an Essex County grand jury returned an indictment charging the petitioner, Juan Ruiz-Santos, with trafficking in 200 grams or more of heroin. *See* Mass. Gen. Laws ch. 94C, § 32E(c)(4). The petitioner was tried before Judge McEvoy and an Essex Superior Court jury from September 28, 2000 through September 29, 2000, when the jury returned a verdict of guilty as charged. That same day, Judge McEvoy sentenced the petitioner to a committed, state prison term of fifteen years to fifteen years and one-day.[1]

The petitioner appealed his conviction to the Massachusetts Appeals Court, where he

---

[1] In Massachusetts, the minimum mandatory sentence for trafficking in 200 grams or more of heroin is fifteen years. Mass. Gen. Laws ch. 94C, § 32E(c)(4).

2

argued that: 1) the evidence was insufficient to convict him; 2) the trial judge erred reversibly by declining to instruct on the lesser included offense of possession of heroin; and 3) cumulative, additional errors resulted in the conviction. In an unpublished order issued pursuant to its rule 1:28, the Appeals Court affirmed the petitioner's conviction on November 24, 2004, and adopted the Commonwealth's reasoning with respect to each appellate issue. *See Commonwealth v. Ruiz-Santos*, 62 Mass. App. Ct. 1112, 818 N.E.2d 641 (2004).

The petitioner then filed an application for leave to obtain further appellate review ("ALOFAR") in the Supreme Judicial Court ("SJC"). In that application, he argued that the evidence was insufficient to sustain his conviction, and that the Appeals Court itself committed error by failing to analyze a trial error that it uncovered during its adjudication of the co-defendant's case.[2] The SJC denied the petitioner's ALOFAR on February 2, 2005. *See Commonwealth v. Ruiz-Santos*, 443 Mass. 1103, 822 N.E.2d 303 (2005).

The petitioner filed for relief in this Court on April 1, 2005. On June 24, 2005, the respondent moved the Court to dismiss the petition on the ground that it contained unexhausted claims and was therefore a "mixed" petition. *Rose v. Lundy*, 455 U.S. 509, 510 (1982). See Docket, #5, 6. The respondent opposed this motion on July 5, 2005. Docket, #8. The Court permitted the petitioner to proceed with the sole exhausted claim (sufficiency of the evidence) on September 19, 2005, Docket, #9, and the petitioner filed his memorandum in support of his petition on February 15, 2006.

---

[2] The petitioner did not identify the "error" in his ALOFAR. The co-defendant's case is *Commonwealth v. Henriquez-Rodriguez*, 58 Mass. App. Ct. 1106, 790 N.E.2d 242 (2003).

3

**STATEMENT OF FACTS**

In its memorandum and order affirming the petitioner's conviction, the Appeals Court did not recite the facts, but instead adopted the reasoning set forth in the Commonwealth's brief on each issue. Consequently, it is fair to presume that the Appeals Court adopted the facts set forth in the Commonwealth's brief, particularly where one of the issues was whether there was sufficient evidence to convict the petitioner.[3] The respondent sets forth the facts as recited in the Commonwealth's brief:

> On February 4, 1999, Massachusetts State Trooper Brian O'Neil obtained a no-knock search warrant[4] for the premises on the second floor, 17 Sanborn Street in Lawrence[5] (Tr. I:69-70). The warrant authorized the police to search the premises, as well as all persons there, including "Oscar Rivera," for both heroin and "articles associated with the preparation, packaging and distribution of heroin" (Tr. I/70-71). As a narcotics investigator assigned to the Essex County

---

[3] It bears noting that in a separate unpublished memorandum affirming the conviction of the petitioner's co-defendant, the Appeals Court summarized the testimony of Trooper Brian O'Neil, who was the sole witness. *See Commonwealth v. Henriquez-Rodriguez*, 58 Mass. App. Ct. 1106, 790 N.E.2d 242 (2003). The respondent has attached a copy of this opinion for the Court's convenience and has filed a copy of the trial transcripts with this memorandum.

[4] In footnote 4 of its brief, the Commonwealth stated: "A no-knock search warrant permits the police to forcibly enter a location without announcing their presence and identity (Tr. I/71). Here, Trooper O'Neil requested a no-knock search warrant because he believed that "there were firearms inside the location" and that giving advance notice that the police were entering could endanger his entry team (Tr. I/71)."

[5] In footnote 5 of its brief, the Commonwealth stated: "The building is number 15-17 Sanborn Street (Tr. I/69). Although the building is not carefully described in the transcript, it appears that it contained two apartments: one on the first floor, 15 Sanborn; the other apartment on the second floor, 17 Sanborn (Tr. I/69). As the defendant notes, D. Br. at 13 n.4, according to the search warrant, the building consisted of two floors and had two front doors (R.A. 12). One was marked "17" and led to the apartment on the second floor of the building (R.A. 12). The other door, marked "15," led to the apartment on the first floor (R.A. 12). Nothing about the building's description at trial or in the search warrant suggested that the apartments were connected in any way or shared access to the hallway immediately outside the front door at the top of the stairs leading to number 17."

4

District Attorney's Office, Trooper O'Neil had received information from a confidential informant about "Oscar Rivera" and a heroin distribution operation at the 17 Sanborn Street apartment (Tr. I/68-69).

Very early the next morning, at approximately 5:15 a.m., the police executed the warrant (Tr. I/72). After several attempts, they found that the front exterior door of the apartment was heavily barricaded (Tr. I/74-75). Another door was propped behind the front door and rested against the wall "at an angle" (Tr. I/74). As the police hit the front door with a battering ram, the second door acted as a brace and supported the front door (Tr. I/74-75). The barricade served its purpose because it delayed the police from entering the building and it also caused "a very loud commotion" (Tr. I/75).

After forcibly entering the exterior front floor, the officers went up the stairs to the door of the apartment (Tr. I/76-77). The stairs did not lead to any other apartments or to a third floor (Tr. I/77, 102). While going up the stairs, the officers yelled "police" because of the loud noises that occurred when they broke through the outside door (Tr. I/75-76). This ensured that the apartment's occupants were aware that the police, and no other individuals, were focribly entering the building (Tr. I/75-76).

The officers broke the interior door and entered the apartment's unfurnished front room (Tr. I/76-78). The apartment also had a television room, a kitchen and two rear bedrooms off the kitchen (Tr. I/77-78).

While securing the apartment, the officers discovered the following occupants: the defendant, the co-defendant Hector Pablo Henriquez Rodiriguez, two women and several children (Tr. I/78-79, 86). The officers found the defendant in the right rear bedroom, where he was still in bed, and they found the co-defendant, who "was already out of bed," in the left rear bedroom where the rear window was "partially broken" and had fresh blood on it (Tr. I/78-79). Below the window, the officers observed a pair of black leather boots; one of the boots had a "sock stuffed in it" (Tr. I/80). After removing the sock, Trooper O'Neil discovered a loaded .380 caliber handgun and then confronted the co-defendant, who identified himself as "Oscar Rivera" (Tr. I/80).

The officers gathered the occupants in the kitchen and, except for the co-defendant,[6] kept them there while other officers searched the apartment (Tr. I/78-79, 86). The defendant remained seated on the kitchen floor (Tr. I/86).

---

[6] In footnote 6 of its brief, the Commonwealth stated: "Two officers took the co-defendant to the hospital immediately after Trooper O'Neil noticed that he had lost a "large amount of blood" from a "very large cut" on the top of his hand (Tr. I/78-79, 85)."

5

Under Trooper O'Neil's supervision, the officers then searched the apartment (Tr. I/86-87). In the right rear bedroom, which the defendant occupied, officers found his social security card and a Bell Atlantic telephone bill addressed to him at "17 Sanborn Street, apartment 2" (Tr. II: 26-27, 34-35). They also found the following documents bearing both the defendant's name and picture: (1) a passport; (2) a Dominican Republic identification card with a New York address; (3) a Rhode Island identification card (Tr. II/26-28). In addition, they found a social security card and a Massachusetts identification card, both in the name of Ippolito Velasquez (Tr. II: 28-29). The defendant's photograph was on the Massachusetts identification card (Tr. II/28-29).

On the kitchen pantry's countertop, Trooper O'Neil observed an electric grinder that he believed contained heroin residue (Tr. I/87). The grinder's appearance indicated to him that it had "been used in preparation for converting heroin in bulk into heroin packaged for distribution" (Tr. I/88).

During their search, the officers also found two "floor hides" (Tr. I/90-91, 104-106). According to the trooper, based on his experience and training, "upper level, higher level drug distribution operations" often use "hides" as locations "where drugs or money or weapons or evidence may be secreted" (Tr. I/90-91).

The first "hide" was in a kitchen closet near the rear bedrooms (Tr. I/89). The closet floor was "double-layered" consisting of two layers of adhesive linoleum tiles, and the police were able to remove an outer layer tile near the floor's center (Tr. I/90). Underneath, a very small, "four or five inch by five inch square" "cut out" allowed access into the space between that floor and the sub-floor (Tr. I/90).

Within this "hide" or hole, the police found approximately $12,500 in cash, an ammunition clip for a .380 caliber handgun, and a box of .380 caliber ammunition (Tr. I/93-95). They also discovered a "large amount of documents" bundled together with an elastic (Tr. I/93). Within the bundle, several documents identified the co-defendant (Tr. I/95-96).

Following the search of the kitchen closet "hide," the officers searched the front hall closet "directly facing the door accessing the apartment" (Tr. I/102). Within the closet, the officers found a box containing a heat sealer (Tr. I/103). According to Trooper O'Neil, based on his training and experience, a heat sealer is used to make heroin bags and then seal them off" (Tr. I/103).

While searching this same closet, the officers also discovered that they could easily remove one of the twelve-inch linoleum tile floor squares (Tr. I/105). Removing this tile revealed another hide: a four-inch by four-inch hole that

6

allowed access underneath the floor (Tr. I/105).

In the hole, the officers found drug-related paraphernalia: a digital scale; a large amount of Scotch tape; boxes containing both stamped and unstamped yellow, glassine bags; red ink pads; a rubber "High Dragon" stamp[7]; and forty-nine packages of mannite, each of which is necessary to take "loose, unpackaged heroin and convert it" into "dosage units" (Tr. II/13-14). The officers also observed that a white-colored plastic bag was present in one section and a "dark green, black trash bag" lined another section (Tr. I/108; II/4, 12). The white plastic bag contained forty-three grams of loose, unpackaged heroin at thirty-three percent purity (Tr. II/12-13).

The green trash bag contained one hundred and sixty-eight clear sandwich bags, each holding fifty yellow glassine bags of heroin and totaling approximately 8375 glassine bags (Tr. II/3-4). A red ink stamp that said "High Dragon," along with a picture of a dragon, was present on 8325 of yellow glassine bags, and the other fifty bags contained "red markings" (Tr. II/4, 10). The yellow glassine bags contained approximately 546 grams of heroin: the "Red Dragon" bags contained 542.74 grams of heroin at thirty percent purity and the bags with "red markings" contained 3.33 grams of heroin at twenty-six percent purity (Tr. II/9-10).

Finally, the police found a large bag of unpackaged heroin in the refrigerator (Tr. II/35-36). This bag contained 95.68 grams of heroin at sixty-three percent purity (Tr. II/36).

## ARGUMENT

Since Ruiz-Santos's petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this Court's review is governed by that act. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). "AEDPA provides that, when a habeas petitioner's claim has been adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

---

[7] In footnote 7 of its brief, the Commonwealth stated: "The trooper explained that using a particular red stamp to mark a glassine bag of heroin is "a marketing tool" that allows heroin users to "associate that brand name or that stamp with high-quality heroin" (Tr. II/19-20).

7

Supreme Court of the United States,' 28 U.S.C. § 2254(d)(1)[,]" *Brown v. Payton*, 544 U.S. ___, 125 S. Ct. 1432, 1438 (2005), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"A state-court decision is contrary to [the Supreme Court's] clearly established precedents if it applied a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result. *Williams v. Taylor*, [529 U.S. 362 (2000)]; *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). A state court decision involves an unreasonable application of [the Supreme] Court's precedents if the state court applies [the] Court's precedents to the facts in an objectively unreasonable manner. *Williams v. Taylor*, [529 U.S.] at 405; *Woodsford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam)." *Brown*, 125 S. Ct. at 1438-1439.

There is no bright line rule as to what constitutes an "objectively unreasonable" application of established Supreme Court precedent. *Williams*, 529 U.S. at 410. As the *Williams* decision makes clear, however, an unreasonable state-court determination is not the equivalent of an incorrect one. *Id.*

> Indeed, because Congress used the word "unreasonable" . . . , and not words like "erroneous" or "incorrect," a federal habeas court "may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 534 U.S. 925 (2001). *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001), *cert. denied*,

8

535 U.S. 960 (2002) (under AEDPA's "broad objective standard, a federal court cannot grant habeas relief simply because it disagrees with or finds error in the state court's application of federal law").

In addition, under the AEDPA, a state court's determination of the facts presented in the state court proceeding are presumed to be correct. *Miller-El v. Dretke*, 545 U.S. ___, 125 S. Ct. 2317, 2325 (2005). Nevertheless, a habeas corpus petitioner may rebut this "'presumption of correctness by clear and convincing evidence.'" *Id.* (quoting 28 U.S.C. § 2254(e)(1)). "The standard is demanding but not insatiable . . . '[d]eference does not by definition preclude relief.'" *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

In his habeas petition, and in his memorandum in support, the petitioner agues that the Appeals Court unreasonably applied the Supreme Court's holding in *Jackson v. Virginia*, 443 U.S. 307 (1979), by determining that there was sufficient evidence to support his conviction for trafficking in 200 grams of heroin or more. Habe. Pet. ¶ 12(A); Pet. Memo. at 9-15, 17. The thrust of the petitioner's argument is that the Commonwealth "never connected petitioner to the stash found in the hallway." Pet. Mem. at 18. Citing *Hurtado v. Tucker*, 245 F.3d 7 (1st Cir.), *cert. denied*, 534 U.S. 925 (2001), the petitioner also argues "that the state court did not give appropriate weight to all of the evidence presented in state court." Pet. Mem. at 17. The petitioner's arguments lack merit because there was ample evidence to support his conviction for trafficking in 200 grams or more of heroin.

9

I.  BECAUSE THERE WAS AMPLE EVIDENCE TO SUPPORT THE PETITIONER'S CONVICTION, THE APPEALS COURT'S DECISION AFFIRMING THE JUDGMENT CANNOT BE SAID TO BE AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS ESTABLISHED BY THE UNITED STATES SUPREME COURT.

In this case, there is no dispute that *Jackson v. Virginia*, 443 U.S. 307 (1979), sets forth the governing federal law concerning the petitioner's claim that there was insufficient evidence to convict him. *See* Pet. Mem. at 17. Pursuant to *Jackson*, a "review of the sufficiency of the evidence requires [the court] to ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Cornier-Ortiz*, 361 F.3d 29, 32-33 (1st Cir. 2004) (quoting *Jackson*, 443 U.S. at 319).[8]

"There are five elements to the charge of trafficking in heroin that the Commonwealth must prove beyond a reasonable doubt, name that (1) the defendant knowingly or intentionally (2) possessed (actually or constructively) (3) [200] grams or more (4) of heroin (5) with the specific intent to distribute it." *Commonwealth v. Ortega*, 441 Mass. 170, 174 n.7, 804 N.E.2d 345, 349 (2004) (citing Mass. Gen. Laws ch. 94C, § 32E(c)(1)). In this case, the petitioner challenges the sufficiency of the evidence demonstrating the possession element, *see* Pet. Mem. at 12, 18 ("no evidence was actually offered against petitioner to support an inference of his constructive possession"), and focuses on the fact that much of the heroin was found in a "common" closet. Pet. Mem. at 11, 14, 18.

---

[8] The rule in sufficiency cases that the evidence is to be viewed in the light most favorable to the prosecution mandates rejection of the petitioner's unelaborated claim "that the state court did not give the appropriate weight to all of the evidence presented in state court." Pet. Mem. at 17.

10

"In order to sustain a conviction under a theory of constructive possession in Massachusetts, the defendant must have known of the presence of the controlled substance and had 'the ability and intention to exercise dominion and control over it'." *Hurtado*, 245 F.3d at 12 (quoting *Commonwealth v. Cruz*, 34 Mass. App. Ct. 619, 614 N.E.2d 702, 704 (1993)).[9] Under Massachusetts law, "mere presence where drugs are discovered is not enough to support an inference of possession of the drugs, the defendant's presence, coupled with a 'plus factor,' i.e. other incriminating evidence may suffice." *Ortega*, 441 Mass. at 174 (citations omitted).

In this case, the Commonwealth introduced ample additional evidence to prove that the petitioner constructively possessed the more than one-kilogram of heroin. To begin with, the petitioner was found in bed in the early morning hours in an apartment that had an unfurnished front room, two "floor hides," one of which had approximately $12,500 in cash, and a box of .380 caliber ammunition, and the other of which had a digital scale, a large amount of Scotch tape, boxes containing both stamped and un-stamped yellow, glassine bags (Tr. I/93-94, II/13-14). Additionally, an electric coffee grinder with heroin residue was in plain view on the kitchen pantry's counter-top (Tr. I/87) and the refrigerator had a bag of unpackaged heroin weighing 95.68 grams (Tr. II/36). Further, the exterior front door was heavily barricaded, preventing access to the stairs that lead only to the petitioner's apartment and the hallway closet (Tr. I/75-79, 102, 104-106). This barricade delayed the police's entry and prevented them from entering

---

[9] It bears noting that in Massachusetts, "constructive possession and actual possession are not different theories in the way that deliberate premeditation and felony-murder are different theories. . . . Rather, they are simply two possible ways of defining the same legal principle." *Commonwealth v. Fernandez*, 48 Mass. App. Ct. 530, 532, 723 N.E.2d 527, 529 (2000).

11

unannounced (Tr. I/75).[10]

Moreover, in the petitioner's bedroom, officers executing the search warrant found his social security card and a telephone bill addressed to him at "17 Sanborn Street, Apartment 2" (Tr. II/26-27, 34-35). They also found the following documents bearing both the defendant's name and picture: (1) a passport; (2) a Dominican Republic identification card with a New York address; and (3) a Rhode Island identification card (Tr. II/26-28). In addition, they found a social security card and a Massachusetts identification card, both in the name of Ippolito Velasquez (Tr. II/28-29). The petitioner's photograph was on the Massachusetts identification card (Tr. II/28-29). These false identifications, found in an apartment that also contained heroin estimated to be worth "around $150,000, maybe $175,000" (Tr. II/42), and related items, allowed the jury to infer the defendant was trafficking in heroin. *See, e.g., United States v. Staula*, 80 F.3d 596, 605 (1st Cir. 1996) (evidence sufficient to prove constructive possession of firearm where defendant owner and operator of vehicle and had "easy access to the gun"). Under these circumstances, there was ample evidence to support the petitioner's conviction and the Appeals Court's holding was entirely harmonious with *Jackson*. The petition for habeas corpus relief should be denied.

                                                  Respectfully submitted,

                                                  THOMAS F. REILLY
                                                  ATTORNEY GENERAL

                                                  /s/ Daniel I. Smulow

---

[10] There was evidence that the barricade served its purpose; the petitioner's co-defendant was found "already out of bed" in the left rear bedroom where the window was broken and had fresh blood on it (Tr. I/78-79). Because it also prevented anyone who did not have access to the petitioner's apartment to access the hallway closet (Tr. I/102), the petitioner's argument that he could not be linked to the kilogram of heroin found in that closet, *see* Pet. Mem. at 10, 14, proves too much.

12

                                      Daniel I. Smulow, BBO # 641668
                                      Assistant Attorney General
                                      Criminal Bureau
                                      One Ashburton Place
                                      Boston, MA 02108
                                      (617) 727-2200, ext. 2949

Dated: March 16, 2006

### Certificate of Service

    I hereby certify that a true copy of the above document was served on Juan Ruiz-Santos, M.C.I. - Norfolk, P.O. Box 43, Norfolk, MA 02056, by first class mail, postage prepaid, on March 16, 2006.

                                                                  /s/ Daniel I. Smulow

### Notice of Paper Filing

    Notice is hereby given that the transcripts of the state court trial proceedings have been filed separately and are available in the Clerk's office.

# EXHIBIT A

14

> 790 N.E.2d 242

58 Mass.App.Ct. 1106

NOTICE: THIS IS AN UNPUBLISHED OPINION.

Appeals Court of Massachusetts.

COMMONWEALTH,
v.
Hector PABLO HENRIQUEZ-RODRIGUEZ.

No. 02-P-792.
June 23, 2003.

MEMORANDUM AND ORDER PURSUANT TO RULE 1:38

An Essex County grand jury returned two indictments against the defendant charging him with trafficking in 200 grams or more of heroin and with possession of a firearm without a license. Prior to trial, the defendant filed a motion to suppress certain evidence seized during the course of the execution of a search warrant. After a nonevidentiary hearing, the motion was denied. After a jury trial, the defendant was found guilty on both indictments.

On appeal, the defendant claims that (1) the motion judge improperly denied the defendant's suppression motion; (2) the sole witness improperly testified as to ultimate issues in the case, including his opinion as to the defendant's guilt; and (3) the defendant was denied his constitutional right to the effective assistance of his trial counsel.

1. The denial of the suppression motion. The defendant claims that the judge committed error in denying the suppression motion because the affidavit supporting the search warrant did not provide the reviewing magistrate with sufficient facts to establish the confidential informant's basis of knowledge.

The affidavit stated that within the previous forty-eight hours, the confidential informant had been in the defendant's apartment where it observed a large quantity of heroin and currency. Besides the defendant, there had been two other individuals, both carrying handguns and acting as guards for the drugs and the cash. The informant also had taken the police to the apartment building and pointed out the method by which the defendant's apartment could be reached in the building. We hold that the contents of the affidavit were sufficient to establish the informant's basis of knowledge. > Commonwealth v. Rodriguez, 49 Mass.App.Ct. 664, 667-668 (2000).

2. The officer's testimony. The defendant claims that his convictions must be reversed because a police officer, who was the only witness, allegedly testified to ultimate issues in the case, including giving his opinion as to the defendant's guilt. We reject the defendant's claim.

The sole witness for the Commonwealth was State Trooper Brian O'Neil, who executed the search warrant at the defendant's premises. On direct examination, O'Neil recited his considerable training and experience as a narcotics investigator.

O'Neil testified that at about 5:15 A.M. on February 5, 1999, he executed a search warrant at 15-17 Sanborn Street in Lawrence.  O'Neil and other officers forced their entry into a barricaded front door on the first floor and then proceeded to the second floor apartment, which they entered.

In the apartment, they found the defendant and the codefendant, two women, and a number of children.  The defendant was in a back bedroom bleeding from a cut and standing near a partially broken window which had fresh blood on it.  Under the window was a pair of boots in which O'Neil found a loaded handgun.  The defendant, who was bleeding, identified himself as "Oscar Rivera."

During the search, the officers found two "floor hides."  In a kitchen closet, under the floor, the officers found $12,500 in cash, ammunition, and a number of documents identifying the defendant, including his passport, social security card, a motor vehicle license, and other documents identifying the defendant as living at the address where the search took place.

In a front hall closet, under the floor, the officers found numerous drug-related paraphernalia, including glassine bags, red ink pads, a rubber "High Dragon" stamp, and bags of large quantities of heroin, some of which were stamped "High Dragon."  A large bag of heroin was discovered in a refrigerator.

On cross-examination, in response to questions from counsel for the defendant and codefendant, O'Neil stated that he did not order a fingerprint analysis of the seized items and also that he did not order the arrest of the two women found in the apartment.

During redirect examination, O'Neil, in response to questions asked by the prosecutor, testified, without objection, that the reason that he did not order fingerprints was "because there was no doubt in my mind who did this, who these things belonged to."  The prosecutor then asked, without objection, "Who would that have been?" and O'Neil responded, "The defendant and codefendant."

On redirect, O'Neil also was asked why he did not arrest the women who were in the apartment.  O'Neil responded that he was "not interested in 16 year-old mothers and, you know, women and children."  Later, on cross-examination, the trooper testified in regard to his failure to arrest the women that the drugs did not belong to the women because "[e]very thing in that house indicated to me who those drugs belonged to and that's based on everything I learned, and I've been doing this for six years.  Those drugs did not belong to those women.  They belonged to the two gentlemen in that apartment."

Here, it is clear that defense counsel was questioning O'Neil's judgment in not ordering a fingerprint analysis of the seized items and not arresting the two women.  When the defendant puts in issue a police officer's judgment or negligence that caused prejudice to the defendant, "the government cannot be precluded entirely from explaining why the action taken was correct in the circumstances."  > Commonwealth v. Lodge, 431 Mass. 461, 467 (2000).  In that instance, "the prosecutor may proceed by inquiring of the officer the reason for each

16

specific omission or decision." Ibid. Here, the prosecutor's questions largely followed that advice but in at least two instances, O'Neil gave his opinion as to the guilt of the defendant. That was error, but because there was no objection, we examine the error under the substantial risk of a miscarriage of justice standard. Such risk exists when we have "a serious doubt whether the result of the trial might have been different had the error not been made." > Commonwealth v. LeFave, 430 Mass. 169, 174 (1999).

Here, the evidence against the defendant was strong and overwhelming including, among other things, documents linking the defendant to the apartment where the drugs and weapon were found. When the Commonwealth's evidence is strong and one-sided, no retrial is required despite the fact that the police testimony exceeded permissible limits. See > Commonwealth v. Rivera, 425 Mass. 633, 645-646 (1997).

The defendant also claims that O'Neil improperly testified that the defendant was engaged in the distribution of drugs. We have examined the trooper's testimony and hold that, for the reasons stated in the Commonwealth's brief at 32-38, there was no error.

Finally, we reject the defendant's claim that O'Neil improperly testified that the defendant was the person pictured in the passport and the Registry of Motor Vehicles identification card. The parties did not contest identification at trial, and the defendant did not claim a lack of nexus to the apartment or to the documents. Contrast > Commonwealth v. Pleas, 49 Mass.App.Ct. 321, 327-328 (2000), where identification of the defendant was a live issue, certain factors were met, and thus the testimony was permitted.

3. Ineffective assistance of counsel. Because of the amount and type of items uncovered by the police while executing the search warrant, defense counsel had difficult cards to play. His strategy of questioning O'Neil's judgment and competency was not manifestly unreasonable. See > Commonwealth v. Haley, 413 Mass. 770, 775 (1992).

Judgments affirmed.